[File No. 6384.]

ELIZABETH COONS, Appellant, v. B. B. BAIR, Administrator of the Estate of Rodney G. Coons, et al.

ERNA COONS, Respondent.

(264 N. W. 660.)

Opinion filed January 20, 1936

*E. R. Sinkler* and *G. O. Brekke,* for appellant.

*B. L. Wilson,* for respondent.

Burr, J.   This is an action to determine adverse claims to a quarter section of land in Burke county.   The trial court found in favor of the defendants and plaintiff demands a trial de novo in this court.

The only issue submitted to the court is one of fact and it must be conceded that if the facts are not as claimed by the plaintiff the judgment is correct.

As usual, there are many facts which are not disputed.   Among these we find that the plaintiff is the mother of three children—Rodney, deceased, and his brother and sister.   The father, George Coons, died in 1929, leaving, as part of his estate, three quarter sections of land —in one of which he had a mere interest and apparently lost it.   The mother said one of the remaining quarters was the homestead the father proved up and got from the United States, and the other was the one involved here.   Before he died he had deeded one quarter to Rodney's brother and one quarter to the sister.   Before the estate of George Coons was settled, the heirs—the mother and the three children being the sole heirs—executed and delivered to Rodney quitclaim deeds to the quarter involved herein and in the deeds it was stated the "buildings on land not included with land hereby transferred."   Until deeded each heir had an undivided interest in the quarter.   Clearly, at that time, it was the intention of the heirs to vest title in the grantee as indicated in the deeds and thus get rid of the undivided interests. Apparently the mother got the homestead proved up by the father, in addition to keeping the quarter standing in her own name, but this is not quite clear.

At that time Rodney was an unmarried man. On the 4th of November, 1929, he and the defendant Erna Coons intermarried and lived together as husband and wife until Rodney died November 23, 1934. During all of this time Rodney and his wife lived with the mother on her land, which was adjacent to the land involved herein.

On the trial of the action the plaintiff introduced in evidence a warranty deed given by Rodney to his mother in October, 1929, conveying all his interest in this land to her. This deed was never recorded and we find from the testimony that the defendant Erna Coons knew nothing about the existence of this deed until it was offered in evidence; neither did the brother nor the sister nor the lawyer for the estate. From the date of its execution and delivery in 1929 until its production in court, the existence of this deed was a secret to all concerned except the mother. All the others considered Rodney the owner and acted on that theory. After his marriage, and with the knowledge of the mother, Rodney and his wife executed a mortgage on the land in question as owners thereof to secure a loan.

On November 15, 1934, the mother, the brother and his wife, and the sister and her husband executed a quitclaim deed to Rodney, covering the land in question, and while there may be some difference of opinion as to the facts, we find clearly established from the evidence that this deed was given for the purpose of canceling the reservation of title to the buildings contained in the previous quitclaim deeds. This is evident from the fact that at this time Rodney and his wife had applied to the Federal Land Bank for a loan on the land and the bank refused to make the loan until there was perfect title to the quarter section; and the brother and sister so considered it. The subsequent proceedings with the Federal Land Bank were clearly to refinance the indebtedness of Rodney.

The dispute in the testimony centers around the purpose of executing the warranty deed and the execution of the latest quitclaim deed. It is the contention of the plaintiff that while she and the brother and sister quitclaimed to Rodney, reserving their interest in the buildings, nevertheless it was not her intention to give Rodney the land; but merely to allow him to have the income from the land during his natural life. But she was not the owner of the land. All she had to

deed was her interest as heir. If the understanding was as she stated, then the children could have quitclaimed to the mother instead of to Rodney and a life estate could have been reserved to Rodney. Apparently no other heir ever heard of such purpose. Further, there is nothing in writing anywhere to indicate this purpose. There is nothing in the testimony of the brother and the sister to show they knew about this purpose, and the fact that the three children each got a quarter would indicate that the parties agreed among themselves that the father's land should finally be thus distributed. No good reason is shown why Rodney would not get a quarter as well as the other children. At that time the mother owned a quarter section of land. This was her own and was the quarter on which she and Rodney and his wife lived. She says she bought this with money obtained from her father. The mother says Rodney was sickly and if this were so it could be deduced readily that his purpose in giving the secret warranty deed was to let the mother have the land if he died—he being then unmarried.

It is shown there were some buildings upon this quarter deeded to Rodney, and probably no buildings upon the property deeded to the brother and sister. This would account for the reservation of title in the buildings.

It is the claim of the mother that the warranty deed given by Rodney shortly before his marriage was in pursuance of the agreement that she was really to have the land and Rodney merely have the income; but there is nothing in writing showing that when he gave the warranty deed there was a reservation of the income from the land and nothing whatever to show that any interest therein was reserved to Rodney. No consideration moved to him for his warranty deed. True it need not be shown, but where the grantor is dead and his purpose important, proof of a consideration would be valuable.

It is the claim of the mother that the reason she, together with her son and his wife and her daughter and the daughter's husband, executed the quitclaim deed to Rodney in 1934 was merely to facilitate the refinancing of the indebtedness against this quarter and at the same time to permit Rodney to raise in addition thereto a sufficient amount to pay a debt she says he owed her and that thereafter he was to redeed the land to her but was prevented from doing so because of his death.

The brother and sister did not know about this, apparently, as their signatures on the deeds were attached on the theory that Rodney was the actual owner and it was necessary to release the reservation of buildings in order to complete his title. There is nothing in writing to show any such agreement and the burden of proof is upon the plaintiff to show this clearly and convincingly. It is true the mother held the warranty deed. However, it is extremely doubtful whether he owed her anything. Rodney's wife, the defendant Erna Coons, was living with him and his mother, and testifies she never heard anything about such indebtedness and never knew of it. She further shows that whereas the mother said part of the indebtedness was for fencing she had furnished Rodney, Rodney had purchased the fencing himself. The contention of the mother simmers down to this proposition—that she was authorizing him to mortgage her own land to pay a debt which she said he owed her. This would make her a party to an attempted fraud—a fraud on the government in its purpose of refinancing real estate mortgages by allowing those not the owners to pretend they had title. On the other hand the daughter-in-law shows that in the conversation between the mother and Rodney relative to the refinancing operations there was talk about increasing the apparent indebtedness of Rodney, not for the purpose of getting money to pay a debt he owed the mother, but that he thereby would get a sufficient amount of money in order to buy a new car. The mother herself admits that such a remark was made by him. The mother had no notes or other evidences of indebtedness, nor could she give a statement of any amount paid to him at any time. She merely said it was cash that she gave him— "I gave him some of it————I didn't give it to him all at once ————just along in 1930, '31, '32." She had no record whatever showing any such payments. In addition the defendant, the daughter-in-law, testified that this extra amount which Rodney was asking to obtain from the Federal Land Bank was "for farming expenses this spring" and that the plaintiff said to him "You could put the money in as to owe it to me and then you can have the money as though it comes in for you." If this be true, the mother was a participant in another fraud. We find, as the trial court found, there is no proof of any such indebtedness from Rodney to the mother.

It is the claim of the mother that there was no delivery to Rodney of the quitclaim deed executed in 1934. In this respect we find for the defendants that there was such delivery. It is shown by the testimony of the brother that this quitclaim deed was for the purpose of getting rid of the reservation of title to the buildings made in the former quitclaim deeds; that one B. L. Wilson, a lawyer, had charge of the getting of this new quitclaim deed and that he represented Rodney in that transaction. The record shows further that the deed was executed and delivered to Wilson for Rodney, that Wilson was representing Rodney, and that this deed was executed and returned to him for Rodney, prior to Rodney's death "and the deed was in my (Wilson's) possession at the time of his death." Wilson shows that he was employed by Rodney for the purpose of securing this deed in order to correct the former deeds; that after it was delivered to him he gave it to Rodney during his lifetime and that Rodney looked it over and apparently returned it to Wilson's possession. There was sufficient delivery of the deed.

It is the claim of the mother that there was no consideration to her for this latest quitclaim deed and that she, having the warranty deed prior thereto, is entitled to have title to the land quieted in her. This is based upon the theory that she was executing the quitclaim deed in order to assist him to refinance his indebtedness rather than with any intent to give him title to the land, it being her claim that he was to redeed it to her. These are mere words on her part. There is no written proof. However, there are facts which speak louder than her words and indicate that this was not the purpose. It must not be overlooked that Rodney was one of the heirs of his father and when the deeds were first given he had an interest in this particular quarter section in his own right. The other children got their share before the father died. There is nothing to indicate that the father did not intend that Rodney should share and share alike with the others; though he had made no deed to him. All interested parties gave him a deed reserving title to the buildings. The secret deal between him and his mother, entered into just prior to his marriage and unknown to all other interested parties, is before us and according to her testimony and her unrecorded deed the mother was the owner of the land

until the joint quitclaim deed was given. Her showing that this quitclaim deed was not intended as a conveyance is founded on her claim that Rodney was to raise some money on her land to pay a debt due her, but while there is testimony to this effect, we are inclined to adopt the view of the trial court that there was no such agreement. The record shows quite clearly that the purpose was as the brother stated—to cancel the reservation of title to the buildings on Rodney's land and clear up the title to his land for him—and if this be so, her claim that there was to be a redeeding to her is without merit. Rodney was dead, his lips were sealed, and the whole tenor of acts is against the plaintiff. The judgment of the lower court is affirmed.

BURKE, Ch. J., and NUESSLE, MORRIS AND CHRISTIANSON, JJ., concur.